_____

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

_____

| | |
|---|---|
| **GARY PATTERSON,** | **MEMORANDUM DECISION AND ORDER** |
| Plaintiff, | |
| v. | **Case No. 2:20-CV-251-DAK-CMR** |
| **LEAR CAPITAL, INC., TED NOUTSOS, TERRY MOLONEY, DANA FRANKFORT,** | **Judge Dale A. Kimball** |
| | **Magistrate Judge Cecilia M. Romero** |
| Defendants. | |

_____

This matter is before the court on Defendants' Motion to Dismiss or Stay in Favor of

Arbitration [ECF No. 14].  On September 16, 2020, the court held a hearing on the motion by Zoom

video conferencing because of the Covid-19 pandemic.  At the hearing, Mark Pugsley and Z. Ryan

Pahnke represented Plaintiff Gary Patterson, and Daniel M. Hayes and Aaron Lebenta represented

Defendants Lear Capital, Inc., Ted Noutsos,, Terry Moloney, and Dana Frankfort.  Having fully

considered the parties' written submissions, oral arguments, and the law and facts related to the

motion, the court enters the following Memorandum Decision and Order.

## BACKGROUND

Lear Capital sells physical precious metals, including numismatic coins, to the public.  Lear

employs Noutsos, Moloney, and Frankfort ("Employee Defendants").  Neither Lear nor the

Employee Defendants were licensed to provide investment advice.  Nonetheless, they allegedly

advised Patterson that an investment in gold and silver would be safer than keeping his money in a

bank or investing in the stock market.

In October 2017, Patterson liquidated his retirement savings, totaling $412,340.27, and invested it into precious metals with Lear.  Patterson used $377,375.00 in retirement savings to purchase Lear's gold and silver coins.  He then exchanged those coins for platinum bars on September 14, 2018, at an approximate value of $197,000.  By December 31, 2018, the platinum bars were worth approximately $141,527.

Prior to these transactions, on October 17, 2017, Patterson signed Lear's Shipping and Transaction Agreement ("Transaction Agreement").  He alleges that Defendants pressured him into signing the agreement online, through the DocuSign system, while he was on the telephone with a Lear employee, and he was not allowed to ask any questions about it.  Patterson alleges that Defendants misrepresented the nature of the Transaction Agreement, telling him that it was just a shipping agreement and nothing more than a mere formality, when in reality it was the final purchase contract.

Paragraph 13 of the Transaction Agreement contains an arbitration provision, which states, in relevant part:

> Arbitration of Disputes: ANY DISPUTE, CLAIM, OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS TRANSACTION AGREEMENT OR THE BREACH, TERMINATION, ENFORCEMENT, INTERPRETATION, OR VALIDITY THEREOF, INCLUDING THE DETERMINATION OF THE SCOPE OR APPLICABILITY OF THIS AGREEMENT TO ARBITRATE, OR ANY OTHER DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF ANY INTERACTION BETWEEN LCI AND CUSTOMER, SHALL BE BROUGHT AND DETERMINED BY ARBITRATION IN LOS ANGELES, CALIFORNIA, BEFORE ONE ARBITRATOR. THE ARBITRATION SHALL BE ADMINISTERED BY JAMS PURSUANT TO ITS COMPREHENSIVE ARBITRATION RULES AND PROCEDURES (IF THE AMOUNT IN CONTROVERSY

EXCEEDS $250,000) OR ITS STREAMLINED ARBITRATION
RULES AND PROCEDURES (IF THE AMOUNT IN
CONTROVERSY IS LESS THAN OR EQUAL TO $250,000).

Despite this written agreement, the Employee Defendants also allegedly assured Patterson

that their agreement would be based on the terms they discussed in prior telephone and email

conversations.  Given Defendants' current position on the scope of the agreement between the

parties, Patterson alleges that the Employee Defendants' prior assurances to him were false.  The

Transaction Agreement states that it applies to all future transactions between the customer and

Lear: "This Transaction Agreement shall control all transactions between LCI [Lear] and Customer

unless and until such time as it is amended by [Lear]."

On February 20, 2020, Patterson filed this action against Defendants in Utah state court,

alleging that Lear wrongfully induced him into using his retirement savings to purchase precious

metals.  Specifically, Patterson asserts six causes of action against Defendants: (1) violation of the

Utah Uniform Securities Act; (2) breach of fiduciary duty; (3) fraudulent misrepresentation; (4)

fraudulent inducement; (5) promissory estoppel; and (6) common law fraud.  On April 15, 2020,

Defendants timely removed Patterson's lawsuit to this court.

## DISCUSSION

### Defendants' Motion to Dismiss or Stay

Defendants argue that this court should dismiss Patterson's Complaint because all six of his

causes of action arise out of his transactions with Lear and are subject to the mandatory arbitration

clause in the parties' Transaction Agreement.  The motion raises several issues: (1) whether an

enforceable arbitration agreement exists; (2) the scope of that agreement; and (3) whether the

arbitration agreement applies to all of the Defendants.

**1. Whether An Enforceable Arbitration Agreement Exists**

Under Section 2 of the Federal Arbitration Act ("FAA"), written arbitration agreements "involving commerce" are presumed "valid, irrevocable, and enforceable." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Here, the parties entered into a written Transaction Agreement containing an arbitration provision and involving commerce within the meaning of the FAA.

There is a strong federal policy "favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). Courts must "rigorously . . . enforce arbitration agreements according to their terms, including terms that specify with whom the parties choose to arbitrate their disputes and the rules under which that arbitration with be conducted." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018).

The Supreme Court has held that "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 530 (2019). If a party challenges the validity of the precise agreement to arbitrate, the federal court must consider the challenge before ordering compliance with that agreement." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010). Refusing to consider such challenges is the equivalent of immunizing arbitration agreements from judicial challenge and elevating them over other forms of contract. *Id.*

Courts are to "apply ordinary state-law principles governing contract formation." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). In this case, Patterson asserts that the court should apply Utah law because he is a resident of this state and the alleged fraud was directed at the state. Defendants contend that the court should apply California law because the Transaction Agreement has a choice of law provision stating that California law applies. But, in any

event, both parties acknowledge that there is no significant substantive difference between the applicable Utah or California law and that applying Utah or California law would produce the same result.

Mutual assent is a fundamental component in the formation of a valid contract. *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017). "[A] meeting of the minds on the integral features of an agreement is essential to the formation of a contract." *LD III, LLC v. BBRD, LC*, 2009 UT App 301, ¶ 14. Mutual assent is determined under an objective standard. *Martinez v. BaronHR, Inc.*, 51 Cal. App. 5th 962 (2020). The objective standard applies "to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Id.*

Here, Patterson objectively manifested his assent when he signed the Transaction Agreement and initialed the page containing the arbitration provision. The Transaction Agreement is only two pages long, the arbitration provision is prominently displayed in all caps, and the language of the provision clearly encompasses anything relating to the parties' transactions. Defendants have met their burden of demonstrating that an agreement exists. Patterson, however, asserts that there are several grounds for finding that the agreement should be set aside. The initial interactions between Patterson and Defendants raise several questions as to whether there was a meeting of the minds concerning the arbitration provision and whether the agreement was fraudulently induced or unconscionable.

First, Patterson asserts that Defendants did not allow him to review any documentation in writing until the payment and fees were received. The parties agree that they conducted all preliminary communications by telephone and that Patterson signed the Transaction Agreement online using DocSign. Patterson's first contact with Lear was over a year before his first

transaction.  Defendants assert that Lear's standard practice is to send its Transaction Agreement to a potential customer immediately after the first contact.  Patterson's contention that he never received anything in writing disputes that Lear's standard practice was followed in this case.  But Patterson does not allege that the Transaction Agreement was not available to read online when he signed the agreement on DocuSign.  Patterson initialed the page with the arbitration provision.  The initial indicates that both pages of the Transaction Agreement were online for Patterson to view before he signed the document. Patterson is not claiming that he signed empty pages online.  If the contents of the agreement were online for Patterson to read before signing, there does not appear to be a need to have the agreement in paper form as well.  The fact that Patterson had a chance to read the two-page agreement before signing it online distinguishes his case from cases where there is a question as to whether the party ever saw the agreement.

However, Patterson also alleges that he understood that he had entered into an oral agreement with Defendants based on the terms discussed in prior emails and his signing of the online document was merely a formality.  The court cannot excuse a party from the obligation of reading a document the party signs.  The first line of the Transaction Agreement provides that it "shall govern the pending and all future transactions between the parties involving Precious Metals."  Patterson also acknowledged on a recorded call that he was aware that all of Lear's policies could be found in their entirety in the Transaction Agreement.

Patterson similarly claims that unbeknownst to him the Transaction Agreement included the arbitration clause buried deep in a single-spaced document and written in very small typeface. However, the Transaction Agreement is only two pages long and the arbitration provision is prominently displayed and emphasized in bold and all caps, in contrast to the majority of the agreement.  In addition, at the bottom of the page containing the arbitration provision, Patterson was

asked to initial that page.  The Transaction Agreement itself does not support Patterson's allegation that the arbitration provision was difficult to see.

Patterson further asserts that Defendants never explained the arbitration provision to him, never orally confirmed that he agreed to arbitration, never asked him to initial the paragraph at issue, and did not permit him to ask questions about the contract during the recorded telephone call.  But Defendants were not legally required to do any of these things.  Defendants presented Patterson with an agreement.  When he was presented with the agreement, he had the ability to read the agreement.  The DocuSign system required Patterson to initial the page with the arbitration provision and the arbitration provision was prominently displayed on that page.  Patterson also had multiple conversations with Lear sales representatives during which he was able to ask questions or state that he did not understand the contents of the agreement.  Defendants submitted recorded telephone conversation in which Patterson could have asked questions, or stated that he did not understand what was happening, but he merely agreed with everything the Lear representative presented.  Patterson claims that the telephone call was high pressure, but all that was required was for him to state that he needed to read the agreement.  There is no evidence to suggest that Patterson was not allowed to read the agreement before signing it.  Patterson had been speaking to Lear representatives for a year, which negates a finding that he was under high pressure.  He appears to have had plenty of time to consider what he was doing.

Patterson compares his case to *Mitchell v. Wells Fargo Bank*, 280 F. Supp. 3d 1261 (D. Utah 2017), and asserts that he should be given a summary trial on whether he agreed to arbitrate.  However, the *Mitchell* case presented significantly different facts.  In *Mitchell*, the court acknowledged that it was a unique case because Wells Fargo had opened fake accounts for the plaintiffs and Wells Fargo was trying to rely on contracts tied to the plaintiffs authorized accounts to

arbitrate a dispute about the unauthorized accounts. *Id*. at 1279.  The court recognized that if the

dispute was a fight over the authorized accounts, it would be much simpler. *Id.*  Patterson's case is

akin to a dispute as to authorized accounts.  Patterson does not contend that he did not know that he

was entering into a transaction with Defendants. *Mitchell* does not help Patterson's case.

Patterson argues that a court can invalidate arbitration agreements for fraud, duress, or

unconscionability and this court should find that the arbitration provision and the provision

delegating the issue of arbitrability to the arbitrator were fraudulently induced, unenforceable, and

substantively and procedurally unconscionable.  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333,

340 (2011).    Under the Transaction Agreement, any dispute "including the determination of the

scope or applicability of this agreement to arbitrate shall be determined by arbitration."  Patterson

claims that he was fraudulently induced, through misleading statements and omissions of material

facts, to enter into the Transaction Agreement.  However, Patterson does not claim that the

arbitration provision itself was obtained by fraud.  A federal court cannot adjudicate a claim of fraud

in the inducement unless the claim is that the arbitration clause itself was induced by fraud.  Claims

of fraud in the inducement of the contract as a whole go to the arbitrator.  *Prima Paint Corp. v.

Flood & Conklin*, 388 U.S. 395, 403-04 (1987).  In this case, Patterson claims fraudulent

inducement as to the Transaction Agreement as a whole.

Patterson further argues that the arbitration provision and provision delegating arbitrability

are unconscionable and unenforceable. *AT&T Mobility*, 563 U.S. at 340.  However, Patterson's

allegations of unconscionability and duress also go to the contract as a whole and, under *Prima

Paint*, should be decided by the arbitrator.

The court concludes that the arbitration provision in the Transaction Agreement is valid and

enforceable.  Patterson's claims of fraud, duress, and unconscionability, which go to the Transaction

Agreement as a whole, do not invalidate the arbitration provision and must be asserted in arbitration.

**2.  Scope of the Arbitration Agreement**

The court need not consider the arbitrability of Patterson's claims because the arbitration provision includes an agreement to arbitrate the scope or applicability of the Agreement.  "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract" and "may not decide the arbitrability issue" as long as "the parties' agreement does so by clear and unmistakable evidence."  *Henry Schein, Inc. v. Archer & White Sales Inc.*, 139 S. Ct. 524, 529-30 (2019).

In this case, the arbitration provision in the Transaction Agreement is clear.  The parties agreed to arbitrate any question on the scope of arbitration or applicability of the Agreement.  Even if the court considers the arbitrability of Patterson's claims, the Transaction Agreement's arbitration provision applies to each of Patterson's claims.  The provision is clear and sufficiently broad to encompass all the claims Patterson asserts against Defendants.  Each of Plaintiff's six causes of action against Defendants arises out of or is related to Patterson's transactions with Lear.  Therefore, the claims are arbitrable and should be determined by the arbitrator.

The FAA provides that if any lawsuit brought in the courts is referable to arbitration under an arbitration agreement, the court shall stay the trial of the action until such arbitration has occurred.  9 U.S.C. § 3.  However, where all issues between the parties are subject to and will be resolved by arbitration, the majority of federal courts have held that a stay serves no obvious purpose and dismissal is appropriate.  *Alarape v. Group 1 Auto., Inc.*, 2006 WL 2990212, at *3 n.2 (D. Colo. Oct. 19, 2006) (collecting cases and noting that Tenth Circuit has not addressed issue directly).  The court, therefore, dismisses all of Patterson's claims without prejudice to being

asserted in arbitration pursuant to the terms of the Transaction Agreement.

### 3. Claims Against Individual Defendants

The individual employee defendants may also enforce the arbitration provision between Lear and Patterson.  The Supreme Court has made clear that state contract law governs the ability of nonsignatories to enforce arbitration provisions.  *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 630-31 (209).  The Transaction Agreement provides that California law is controlling.  Under California contract law, the Employee Defendants "were acting as agents for" Lear and "are entitled to the benefit of the arbitration provision."  *Dryer v. Los Angeles Rams*, 40 Cal. 3d 406, 418 (1985).  Patterson alleges in his Complaint that the Employee Defendants were Lear's employees and agents.

Even if Utah law applied, the Utah Supreme Court has recognized that a nonsignatory may invoke the theory of equitable estoppel against a signatory that is resisting arbitration.  *Ellsworth v. Am. Arbitration Ass'n*, 148 P.3d 983, 989 n.1 (2006).  This estoppel theory applies "when the claims against [the nonsignatories] arise from duties contained in the contract and there is a close relationship between the entities in question."  *Chung & Assocs., Inc. v. Sanders Mgmt. Servs., Inc.*, 2010 WL 11561404, at *6 (D. Utah Oct. 7, 2010).

In this case, Patterson's allegations demonstrate the close relationship between Lear and the Employee Defendants as Lear's alleged misconduct is derivative of the Employee Defendants' alleged misconduct.  Accordingly, Patterson's claims against the individual defendants are subject to the arbitration provision in the Transaction Agreement.  The court, therefore, dismisses Patterson's claims against the individual defendants without prejudice to being asserted in arbitration pursuant to the terms of the Transaction Agreement.

### CONCLUSION

Based on the above reasoning, the court GRANTS Defendants' Motion to Dismiss in Favor

of Arbitration [ECF No. 14].

DATED this 15th day of October, 2020.

BY THE COURT:

Dale A. Kimball,
United States District Judge